NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0753n.06

No. 11-3663

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Jul 12, 2012*

LEONARD GREEN, Clerk

|                         |     |                                   |
|-------------------------|-----|-----------------------------------|
| MARCUS L. HARRIS,       | )   |                                   |
|                         | )   |                                   |
|    Petitioner-Appellant, | )   | ON APPEAL FROM THE UNITED         |
|                         | )   | STATES DISTRICT COURT FOR THE     |
| v.                      | )   | SOUTHERN DISTRICT OF OHIO         |
|                         | )   |                                   |
| MICHAEL SHEETS, Warden, | )   |                                   |
|                         | )   |                                   |
|    Respondent-Appellee.   | )   |                                   |
|                         | )   |                                   |

Before: SUTTON and GRIFFIN, Circuit Judges; HOOD, District Judge.[*]

SUTTON, Circuit Judge.   A jury convicted Marcus Harris of aggravated murder, kidnapping, aggravated burglary, aggravated robbery and felonious assault.   After pursuing his appeals in state court, Harris filed a petition for a writ of habeas corpus raising a *Batson* claim and a claim of ineffective assistance of appellate counsel.   The district court denied the petition. We affirm.

I.

On September 11, 2003, two masked men entered the home of Scott and Angela Mellinger.   *State v. Harris*, No. 06 JE 36, 2007 WL 1806057, at \*1 (Ohio Ct. App. June 21, 2007).   One of the intruders held the Mellingers' eleven-year-old son on the floor at gunpoint while the other, later identified as Harris, entered the master bedroom.   *Id.*   Once in the room,

_____

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Harris tried to hold Angela and Scott Mellinger at gunpoint. *State v. Harris*, No. 04 JE 44, 2006 WL 1868322, at *1 (Ohio Ct. App. June 27, 2006). Scott began wrestling with Harris. *Id.* Harris shot Scott twice, first superficially across the abdomen, then fatally in the head. *Harris*, 2007 WL 1806057, at *1.

The State charged Harris with aggravated murder with prior calculation and design, and with aggravated murder while committing or attempting to commit kidnapping, robbery or burglary. *Id.* Death specifications were added to the latter charge. *Id.* Harris also was charged with two counts of kidnapping, two counts of aggravated burglary, four counts of aggravated robbery and two counts of felonious assault. *Id.*

During voir dire, the prosecutor used a peremptory challenge to remove Delores Livingston, an African-American, from the jury. *Harris*, 2006 WL 1868322, at *2, 5–6. Harris challenged the strike, and the trial court rejected the challenge. *Id.* at *2.

The jury found Harris not guilty of aggravated murder with prior calculation and design, but guilty of aggravated murder during a robbery, kidnapping and burglary and guilty of the death specifications. *Harris*, 2007 WL 1806057, at *1. The jury also found Harris guilty of the remaining offenses. *Id.* Following a mitigation hearing, the jury recommended a sentence of life without parole. *Id.* The trial court imposed the recommended sentence for the aggravated murder conviction and added 61 years for the remaining offenses. *Id.*

Harris timely appealed his conviction and sentence. The state courts affirmed his conviction but eventually modified his sentence so that the firearm-specification sentences ran concurrently with each other. Harris filed a § 2254 habeas petition. The district court rejected the petition and granted a certificate of appealability on the *Batson* claim and an ineffective-assistance claim.

2

II.

Under the Antiterrorism and Effective Death Penalty Act, a federal court may not grant a writ of habeas corpus unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established" Supreme Court precedent or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A.

Harris claims that the state court's rejection of his *Batson* claim meets this high standard. *Batson v. Kentucky*, 476 U.S. 79 (1986); *see also Miller-El v. Dretke*, 545 U.S. 231 (2005).

The Equal Protection Clause forbids prosecutors from using race-based peremptory challenges. *Batson*, 476 U.S. at 89. A three-part test applies: the defendant must make a prima facie showing that the prosecutor made a race-based peremptory challenge; the burden shifts to the prosecutor to give a race-neutral explanation for the strike; and the burden shifts back to the defendant to show that the prosecutor engaged in purposeful discrimination. *Id.* at 95–98.

The Ohio Court of Appeals held that Harris failed at the last stage—that he did not show that the prosecutor struck Livingston from the venire based on race. In doing so, it credited the prosecutor's explanation: Livingston's son had been convicted of numerous crimes, including aggravated drug trafficking and burglary; her son was last convicted the year before Harris's trial; Livingston's sister also had an extensive criminal history in the county; and, in view of this family history, it was reasonable to question whether Livingston could be a fair and impartial juror. *Harris*, 2006 WL 1868322, at *6. The state court added that the prosecutor's failure to question Livingston about her sister during voir dire was not evidence of pretext because Livingston did not mention her sister in the juror questionnaire or during voir dire. *Id.* The

3

court also rejected Harris's argument that the prosecutor's failure to strike other members of the venire who had friends and family with criminal histories was evidence of pretext. *Id.* at *7. "[A]ll but one of the prospective jurors [Harris] identifie[d]," the court explained, "were never actually sworn in as jurors in [his] case," and the one juror identified by Harris who was impaneled had only a nephew and distant cousins who had been convicted of crimes—far fewer crimes, it turns out, than those committed by Livingston's more-direct family members. *Id.*

This reasoning does not contradict *Batson* or *Miller-El*—for the reasons mentioned above and a few others mentioned below. During voir dire, Livingston testified that she recognized the name of one of the potential law enforcement witnesses from a prior incident in which her son had been arrested. Livingston added that she might know one other witness. When the prosecutor asked if the prospective jurors had any prior contact with his office, Livingston replied that, in addition to the situation with her son, several members of her family had suffered from drug addiction or been involved in drug trafficking; as a result, she recognized the names of several police officers and judges. After questioning Livingston during voir dire, the prosecutor confirmed that his office had secured convictions against Livingston's son for drug offenses as recently as the year before Harris's trial. When Harris challenged the State's attempt to strike Livingston, the prosecutor cited Livingston's family's extensive contact with the criminal justice system as his reason for doubting her capacity to judge the prosecution's case fairly.

This justification is facially race-neutral, clear and specific. *Batson*, 476 U.S. at 98 & n.20. The trial court and Ohio Court of Appeals reasonably credited the prosecutor's race-neutral explanation. Harris does not identify any juror whose family had a comparable history of criminal convictions to Livingston's family, much less a juror with a son against whom the prosecutor's office had *just* obtained a conviction and a sister with a twenty-one-year history of

4

criminal convictions. Other prospective jurors noted that relatives or friends had been arrested or convicted, but none had a sibling or child who had been arrested and prosecuted. For example: jurors Neil and Balvin had cousins, and Jurors Kendle and Washel had nieces and nephews who had been arrested and prosecuted for crimes; Juror Moustaader knew the son of a co-worker who had been imprisoned; Juror Smith's father-in-law had been imprisoned before his marriage; Jurors Ammons and Cline had friends who had been convicted of crimes; Juror Ingram had been arrested but not prosecuted for a crime. These are all materially different interactions with the criminal justice system. Juror Mumaw did have a son who was imprisoned but she was stricken for cause. Accordingly, it was reasonable for the Ohio Court of Appeals to conclude that the failure to use peremptory strikes against these other prospective jurors did not amount to race discrimination. *Harris*, 2006 WL 1868322, at *7.

Harris insists that the prosecutor's reliance on Livingston's sister's criminal record is implausible given that the prosecutor failed to question Livingston about her sister during voir dire even though she disclosed her sister's criminal record on her juror questionnaire. To the extent Harris's argument relies on the contents of Livingston's juror questionnaire, we cannot consider it because the questionnaire was not part of the record before the state appellate court. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). The broader point is that the recent conviction of Livingston's son, after an investigation by the same prosecutor's office, alone would give a prosecutor race-neutral doubts about impartiality.

Nor did the prosecutor's questioning of Livingston regarding her views about the death penalty show pretext. Harris argues that the prosecutor questioned Livingston longer and in

5

more depth than he questioned other jurors on the issue of possible penalties. Not only is the disparity in questioning less pronounced than Harris suggests, but there is also a rational explanation for the length of the prosecutor's inquiry: Livingston was an evangelical minister, giving the prosecutor a reason to inquire about her capacity to impose a death sentence in light of her faith. The Ohio Court of Appeals reasonably rejected Harris's *Batson* claim.

B.

Harris also claims he was deprived of the effective assistance of appellate counsel because his attorney failed to make the juror questionnaires part of the appellate record that was before the Ohio Court of Appeals. To succeed, Harris must show that his attorney's performance was deficient and prejudiced Harris's defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). As for prejudice, Harris must show that there is a reasonable possibility that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 694. Harris's burden is not light, as we apply a "doubly deferential" standard of review when analyzing counsel's performance in the context of a § 2254 petition. *Cullen*, 131 S. Ct. at 1403 (internal quotation marks omitted).

The key problem is prejudice. Even if we assume Harris's counsel was deficient in failing to designate the juror questionnaires as part of the appellate record, a point we need not resolve, Harris has no reasonable prospect that the decision would have come out differently. As shown, Harris has not established that any prospective juror had similarly close family members with similar criminal records as those in Livingston's family. On this record, the state court reasonably concluded that Harris was not prejudiced by his counsel's failure to designate the questionnaires as part of the appellate record.

III.

For these reasons, we affirm the judgment of the district court.